**John J. CRONIN, a/k/a The Hudson Riverkeeper; Cynthia E. Poten, a/k/a The Delaware Riverkeeper; The Hudson Riverkeeper Fund, Inc.; The New York Coastal Fishermen's Association, Inc.; The American Littoral Society, Inc.; Michael Herz, a/k/a The San Francisco Baykeeper; Kenneth Moser, a/k/a The Puget Soundkeeper; Terrance E. Backer, a/k/a The Soundkeeper; The Long Island Soundkeeper Fund, Inc.; and Andrew Willner, a/k/a The Baykeeper for the New York and New Jersey Harbor Estuary, Plaintiffs,**

v.

**Carol M. BROWNER, as Administrator of the United States Environmental Protection Agency, Defendant.**

No. 93 Civ. 0314 (AGS).

United States District Court,
S.D. New York.

July 24, 1995.

P. Kent Correll, New York City, Christopher H. Bartle, Dolgenos Newman & Cronin,

New York City, Theresa Rose Hanczor, Hudson Riverkeeper Fund, Garrison, New York, for Plaintiffs.

Mary Jo White, United States Attorney for the Southern District of New York by Steven M. Haber, Assistant United States Attorney, New York City, Scott J. Jordan, Environmental Defense Section, U.S. Department of Justice, Washington, DC, for Defendant.

### OPINION AND ORDER

SCHWARTZ, District Judge:

### INTRODUCTION

Plaintiffs, various environmental organizations, initiated this action pursuant to the "citizen suit" provision, § 505 of the Clean Water Act [1] ("CWA" or "the Act"), 33 U.S.C. § 1365, to compel the United States Environmental Protection Agency ("EPA"), through its Administrator, to perform an allegedly non-discretionary duty under section 316(b) of the Act. 33 U.S.C. § 1326(b). Section 316(b) governs the location, design, construction, and capacity of existing and new cooling water intake structures, particularly those utilized in the utilities industry. Amended Complaint ¶ 31. Plaintiffs seek a declaratory judgment and an order directing EPA to issue regulations under § 316(b), and request that this Court retain jurisdiction over the matter until the Administrator issues those regulations. Plaintiffs also allege that, absent the issuance of such regulations, utility companies are ignoring the requirement under § 316(b) that any standards established under §§ 301 or 306 of the Act, 33 U.S.C. § 1311 or § 1316, reflect the "best technology available" for minimizing adverse environmental impacts from cooling water intake structures. Amended Complaint ¶ 28.

Plaintiffs and EPA stand on the verge of settlement of the matter, having submitted to the Court a proposed Consent Decree which

inter alia, sets forth a timetable by which EPA will either issue regulations regarding cooling water intake structures or determine that no such regulations are necessary. Consent Decree ¶ 2.[2] Currently pending before the Court is the motion by 56 individual electric utility companies, the Edison Electric Institute, the National Rural Electric Cooperative Association, and the American Public Power Association to intervene in this action pursuant to Rule 24 of the Federal Rules of Civil Procedure. The individual utilities and the three associations (collectively "Proposed Intervenors") all are members of the Utility Water Act Group, a group formed for collective participation by the electric utility industry in rulemakings of EPA under the Act.

For the reasons set forth below, the motion to intervene is denied.

### BACKGROUND

#### Purpose and Overview of the Act

The objective of Congress in passing the Act was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a). To effectuate this purpose, Congress declared a series of national goals, including elimination of the discharge of pollutants into this country's waters. CWA § 101(a)(1), 33 U.S.C. § 1251(a)(1). The means of achieving these purposes is broad— a complete prohibition on discharges of all pollutants into navigable waters, except where authorized under a specific provision of the Act. CWA § 301(a), 33 U.S.C. § 1311(a).[3]

Congress intended the Act to be implemented with respect to existing sources in two stages. First, discharges of pollutants would be limited based on the "best practicable control technology currently available" by July 21, 1977. CWA § 301(b)(1), 33 U.S.C.

---

1. 33 U.S.C. §§ 1251–1387 (1990).

2. Familiarity with the provisions of the proposed Consent Decree is presumed. For purposes of this Opinion and Order, we describe only those portions of the Consent Decree relevant to the instant motion.

3. Although this provision prohibits simply the "discharge of any pollutant," Congress defined such term to include "any addition of any pollutant to navigable waters from any point source." CWA § 502(12)(A), 33 U.S.C. § 1362(12)(A).

§ 1311(b)(1). This represents the initial stage of pollutant-discharge reduction, designed to bring all sources in an industrial category up to the level of the average of the best source in that category. *See EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 75–76, 101 S.Ct. 295, 303, 66 L.Ed.2d 268 (1980).

Second, by March 31, 1989, all point sources nationwide would be required to meet more stringent effluent limitations based on either the "best conventional pollutant control technology," CWA § 301(b)(2)(E), 33 U.S.C. § 1311(b)(2)(E), or the "best available technology economically achievable," CWA § 301(b)(2)(A), 33 U.S.C. § 1311(b)(2)(A), depending on the types of pollutants discharged.

In addition, CWA § 306 subjects new sources to a separate set of standards referred to as New Source Performance Standards. 33 U.S.C. § 1316. These standards are based on the "best available demonstrated control technology" for conventional, nonconventional and toxic pollutants. CWA § 306, 33 U.S.C. § 1316.

### Section 316(b)

Section 316(b) of the Act, 33 U.S.C. § 1326(b), provides that standards promulgated under CWA §§ 301 and 306, 33 U.S.C. §§ 1311 and 1316, must require cooling water intake structures to reflect the best technology available for minimizing environmental impacts. Section 3126(b) provides as follows:

> Any standard established pursuant to [CWA §§ 301 or 306] and applicable to a point source shall require that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing environmental impact.

33 U.S.C. § 1326(b). Sections 301 and 306 require that EPA set effluent limitations guidelines and standards applicable to existing point sources and new point sources, respectively, on specific dates that are set out in those provisions. 33 U.S.C. §§ 1311(b), 1316(b).

In the mid–1970's EPA decided that it would promulgate a single regulation under section 316(b) that was applicable to all categories of point sources, rather than include a section 316(b) provision within all individual effluent limitations guidelines and new source performance standards under sections 301 and 306. This regulation was issued in 1976 and codified at 40 C.F.R. Part 402.

In 1977, however, the Fourth Circuit remanded the regulation to EPA because of a procedural deficiency in the promulgation of the regulation. *Appalachian Power Co. v. Train,* 566 F.2d 451, 457 (4th Cir.1977). The court did not reach the substantive validity of the regulation.

Since the decision in *Appalachian Power* in 1977, EPA has withdrawn the section 316(b) regulation, 44 Fed.Reg. 32956 (June 7, 1979) and has not promulgated a new cooling water intake structure regulation. EPA has, however, continued to reserve space in the Code of Federal Regulations for such a regulation. 40 C.F.R. Part 125, Subpt. I. As noted, in this action, plaintiffs seek to require EPA to promulgate a new regulation.

## DISCUSSION

### Standard for Mandatory Intervention Under Rule 24(a)(2)

To qualify for intervention as of right under Rule 24(a)(2), an applicant must demonstrate that: (1) it has an interest relating to the subject of the action; (2) it is so situated that the disposition of the action may as a practical matter impair or impede its ability to protect its interest; and (3) its interest is not adequately represented by existing parties. Fed.R.Civ.P. 24(a)(2); *Restor–A–Dent Dental Labs, Inc. v. Certified Alloy Prods., Inc.,* 725 F.2d 871, 874 (2d Cir.1984); *In re Ivan F. Boesky Secs. Litigation,* 129 F.R.D. 89, 94 (S.D.N.Y.1990).

### Standard for Permissive Intervention Under Rule 24(b)

This Court may permit intervention under Rule 24(b): (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question

of law or fact in common. Under both prongs of this rule, in exercising our discretion we "must consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b).

For the reasons set forth below, Proposed Intervenors fail to satisfy the foregoing standards for either mandatory or permissive intervention in this action.

### Subject–Matter Jurisdiction

One of the central points asserted by the Proposed Intervenors is that, absent intervention as of right or by permission of the Court, they—the primary users of cooling water intake structures—will not have the opportunity to raise a jurisdictional objection to this Court's consideration of the proposed Consent Decree which addresses the regulation of said structures. Proposed Intervenors' Mem. at 10–15. More precisely, Proposed Intervenors contend that insofar as this Court will fail to reach the merits of plaintiffs' claims in determining whether to enter the proposed Consent Decree, we lack subject matter jurisdiction to enter the proposed Consent Decree at all.

Because we are obligated at all times to satisfy ourselves of our subject-matter jurisdiction, *see, e.g., Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986), we must consider Proposed Intervenors' argument as a threshold matter, without regard to the outcome of the motion to intervene. For the reasons set forth below, we conclude that Proposed Intervenors' position is flawed legally, factually, and as a matter of public policy.

■ The legal theory of the Proposed Intervenors derives from the assumption that, at least with respect to the class of lawsuits (i.e., citizen suits under the EPA) of which this is one, or, alternatively, because of the specific circumstances surrounding this action, the inquiry that this Court must undertake to satisfy itself of subject matter jurisdiction is coextensive with addressing the merits of plaintiffs' claims. This assumption finds no support in the law, particularly where, as here, the Court examines subject matter jurisdiction in the context of a proposed settlement.

The Supreme Court articulated the threshold analysis of subject matter jurisdiction that we are obliged to undertake in *Bell v. Hood,* 327 U.S. 678, 681–83, 66 S.Ct. 773, 775–76, 90 L.Ed. 939 (1946):

> Before deciding there is no jurisdiction, the District Court must look to the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and the laws of the United States ... The reason for this is that the court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief as well as to determine issues of fact arising in the controversy.
>
> Jurisdiction, therefore, is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

The standard that must be met in order to vest subject matter jurisdiction in this Court, then, is not an especially harsh one—and certainly does not involve addressing the merits of plaintiffs' claims. To be more precise, this action and the concomitant proposed Consent Decree are properly before us if the claims alleged in the complaint are more than "wholly insubstantial and frivolous." *Id.* at 682–83, 66 S.Ct. at 776.[4]

---

4. Section 505(a)(2) vests jurisdiction in this Court "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2). Plaintiffs allege a failure by EPA to discharge its

In *Duke Power Co. v. Carolina Envt'l Study Group, Inc.*, 438 U.S. 59, 70–72, 98 S.Ct. 2620, 2628–30, 57 L.Ed.2d 595, the Supreme Court further specified the nature of the foregoing standard in upholding the sufficiency of a complaint in the face of jurisdictional objections similar to those raised by Proposed Intervenors:

> For purposes of determining whether jurisdiction exists under [28 U.S.C.] § 1331(a) to resolve appellees' claims, it is not necessary to decide whether appellees' alleged cause of action against the NRC ... is in fact a cause of action "on which [appellees] could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 [66 S.Ct. 773, 776, 90 L.Ed. 939] (1946). Instead, the test is whether " 'the cause of action alleged is *so patently without merit* as to justify ... the court's dismissal for want of jurisdiction.' " *Hagans v. Lavine*, 415 U.S. 528, 542–543 [94 S.Ct. 1372, 1381–1382, 39 L.Ed.2d 577] (1974), quoting *Bell v. Hood*, supra, at 683 [66 S.Ct. at 776]. (Emphasis added.) See also *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666, 94 S.Ct. 772, 776, 39 L.Ed.2d 73 (1974) (test is whether right claimed is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy") ...

The further question of whether appellees' cause of action under the Constitution is one generally to be recognized need not be decided here. The question does not directly implicate our jurisdiction.... [Q]uestions of this sort should not be resolved on such an inadequate record.... It is enough for present purposes that the claimed cause of action ... is sufficiently substantial and colorable to sustain jurisdiction....

Accordingly, we need not—and in fact should not—determine the merits of plaintiffs' allegations in this matter in order to resolve the threshold jurisdictional issue. Rather, we must determine that the claim is "neither immaterial nor insubstantial." *Goldman v. Gallant Securities, Inc.*, 878 F.2d 71, 73 (2d Cir.1989) (quoting *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 239 (4th Cir.1988)).

■ The complaint in this action clearly satisfies the foregoing standard.[5] As noted,

---

mandatory duty to issue regulations under § 316. Amended Complaint, ¶¶ 3, 21, 27–28, 31.

**5.** Proposed Intervenors seek to avoid the jurisdictional framework set forth above by suggesting that it applies only to actions arising under the general federal question statute, 28 U.S.C. 1331, and, therefore, not to a citizen suit under the EPA. Utilities Suppl.Mem. at 7 n. 4. This position is untenable. Courts have routinely applied a subject matter jurisdiction analysis that does not involve addressing the merits of plaintiff's claims in actions arising under jurisdictional statutes other than the general federal question statute. *See, e.g., IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1055 (2d Cir. 1993) (applying jurisdictional rule in action brought under the Multiemployer Pension Plan Amendment Act, 29 U.S.C. § 1381, the relevant portion of which states that the district courts "shall have exclusive jurisdiction" over actions brought by persons "adversely affected by the act or omission of any party under this subtitle," 29 U.S.C. §§ 1451(a), (c)), *cert. denied,* —— U.S. ——, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Gallant Securities, Inc., supra*, 878 F.2d 71 (2d Cir. 1989) (applying standard where complaint alleged jurisdiction both on the jurisdictional provision of the Securities Exchange Act, 15 U.S.C. § 78aa and on 28 U.S.C. § 1331, but where the magistrate, district court, and circuit court centered their jurisdictional analyses solely upon the Exchange Act provision); *see also, ManaSota–88, Inc. v. Tidwell*, 896 F.2d 1318, 1323 (11th Cir. 1990) (affirming denial of intervention by power companies in an action to compel promulgation of regulations under CWA without deciding whether EPA was under a nondiscretionary duty to issue such regulations, stating: "we express no opinion as to the merits of plaintiff's claims...."); *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor*, 619 F.2d 231, 243 (3d Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981) (reversing district court's dismissal of complaint for lack of subject matter jurisdiction in action brought under § 505, stating: "We do not decide today whether, on the merits, plaintiffs can prove that the threatened discharges from Three Mile Island are radioactive wastes within the scope of the federal Water Pollution Control Act. We hold only that plaintiffs' allegations under the Act were sufficient for the purpose of subject matter jurisdiction.").

This Court, moreover, has previously rejected Proposed Intervenors' argument. *See Hudson Riverkeeper Fund, Inc. v. Orange and Rockland Utilities*, 835 F.Supp. 160, 165 (S.D.N.Y.1993) (J. Brieant)

> ("This argument [that plaintiff's claims fell outside the jurisdictional scope of § 505(a)(1)(A) because they did not constitute an enforcement

plaintiffs have alleged that the Administrator has a non-discretionary duty to promulgate regulations establishing standards pursuant to §§ 301 and 306, which require that cooling water intake structures reflect the best technology available for minimizing adverse environmental impact, and has failed to perform that duty. Amended Complaint ¶¶ 3, 21, 27–28, 31. Examination of the relevant portions of the CWA, their legislative history, and judicial decisions addressing them confirms that plaintiffs' allegations can in no way be regarded as "insubstantial" or "frivolous," and this Court, therefore, exercises subject-matter jurisdiction over those claims.

■■■■ A non-discretionary or mandatory duty arises only where an agency bears a duty to act by a date certain. *See Sierra Club v. Thomas,* 828 F.2d 783 (D.C.Cir.1987). Proposed Intervenors contend that § 316(b) does not establish a mandatory duty because it sets forth no bright line deadlines for the issuance of regulations under it. Proposed Intervenors' Suppl. Memo at 9–10. This argument is meritless.

■■■ As both plaintiffs and the Government[6] point out, § 316(b) explicitly references §§ 301 and 306 of the Act, which *do* contain specific deadlines for the issuance of effluent limitations guidelines and new source performance standards. The crux of the dispute, then, is whether the date certain required to establish the existence of a mandatory duty must be found in the same paragraph or section that sets forth the duty. We find—consistent with persuasive decisional authority on the issue—that it does not.

In the case most directly on point, *Virginia Elect. & Power Co. v. Costle,* 566 F.2d 446 (4th Cir.1977) ("*VEPCO* ) the 4th Circuit considered whether it had jurisdiction to hear a challenge to the validity of the 1976 section 316(b) regulation. In deciding this issue, the *VEPCO* court focused on whether a section 316(b) regulation should be considered a form of limitation under sections 301 and 306, because the circuit court's jurisdiction was limited to review of a specific list of agency actions including the promulgation of "any effluent limitation or other limitation under [sections 301, 302, 306, or 405 of the Clean Water Act]." CWA § 509(b)(1)(E), 33 U.S.C. § 1369(b)(1)(E). The *VEPCO* court concluded that a section 316(b) regulation is an "other limitation" under sections 301 and 306, and, on that basis, held that it had jurisdiction to hear plaintiffs' section 509 claim. 566 F.2d at 450.

In deciding the jurisdictional issue with respect to plaintiffs' section 505 claim, we face the identical issue, namely, the relationship between section 316(b) and sections 301 and 306. The result under section 505 is the same as the result under section 509: the issuance of a regulation under section 316(b) constitutes the issuance of an "other limitation" under sections 301 and 306. In *VEPCO* the substantive challenge to the section 316(b) regulation was held to be proper in the circuit court, under section 509, *see* 566 F.2d at 450; here, similarly, we hold that section 316(b), as enacted, created a mandatory duty enforceable in the district court, because the time limits in sections 301 and 306 govern EPA's duty to take action under section 316(b).

In support of their position, Proposed Intervenors rely upon *EDF v. Thomas,* 870 F.2d 892 (2d Cir.1989). This reliance is misplaced. Rather than standing for the proposition that, in order to state a mandatory duty, the same statutory provision that sets forth the duty to take action must also estab-

---

action but, instead, an effort to modify the defendants' permits] is at most an argument that the complaint fails to state a claim and is not a valid attack on subject matter jurisdiction. We take our subject matter jurisdiction from the face of the complaint ... Just as in *Bell v. Hood,* ... the papers submitted in support of this motion do not show that the claim is insubstantial or frivolous. The complaint does, in fact, raise serious questions both of law and fact, which this Court can decide only after it has assumed subject matter jurisdiction over the controversy.)

Accordingly, no basis exists to apply a jurisdictional analysis other than that articulated in *Bell v. Hood,* and reiterated subsequently, to the instant action.

**6.** The Government has taken no position on the motion to intervene, but has submitted memoranda addressing certain legal issues essential to the motion.

lish the deadline by which that action must be taken, as Proposed Intervenors suggest, the Second Circuit held in *Thomas* only that where a provision contains *both* a duty and a deadline, that provision states a mandatory duty. *Id.* The court did not hold, because it was not faced with the issue, that a provision that references another provision for the deadline fails to state a mandatory duty.

Indeed, the language of *EDF v. Thomas* strongly suggests that such a referencing of one statutory provision by another *would*—in the view of the Second Circuit—create a mandatory duty. In addressing the appellants' argument that Section 109(d) of the Clean Air Act, 42 U.S.C. § 7409(d), created a mandatory duty because it "must be interpreted in light of the mandatory language of Sections 109(a) and (b)," the Second Circuit rejected that argument principally on the ground that "Section 109(d) contains no cross-reference to Section 109(a)." 870 F.2d at 898. Had such cross-referencing been present—as it is between section 316(b) and sections 301 and 306—the *EDF v. Thomas* court apparently would have concluded that a mandatory duty was established.[7]

Proposed Intervenors also incorrectly imply that section 316(b) could *only* be implemented through section 301 and 306 standards, and not through a free-standing regulation. Proposed Intervenors Suppl. Mem. at 13. Although inclusion of section 316(b) requirements in each section 301 and 306 standard is one permissible manner of implementing section 316(b), other permissible methods exist. EPA was also free to choose, as it did, to implement section 316(b) by issuing one overarching regulation that would apply to all categories of point source subject to sections 301 and 306 that utilize cooling water intake structures. The decision to implement section 316(b) through such a regulation is a reasonable construction of the statutory provision, and is therefore entitled to our deference. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *NYDSS v. Shalala*, 21 F.3d 485, 491 (2d Cir.1994). In sum, then, we find—based on the foregoing—that the mandatory deadlines established in sections 301 and 306, are properly applied to regulations issued pursuant to section 316(b).[8]

7. The Proposed Intervenors also contend that section 316(b) creates no mandatory duty because it only requires that any standards that "may" be established pursuant to sections 301 and 306 include best technology available for cooling water intake structures. Proposed Intervenors Mem. at 11–12. Sections 301 and 306, however, clearly require the establishment of standards. *See, e.g.*, 33 U.S.C. § 1311(b)(1)(A) ("there *shall* be achieved ... effluent limitations") (emphasis added); *id.* § 1316(b)(1)(B) ("the Administrator *shall* propose and publish regulations establishing Federal standards") (emphasis added); *see also Escoe v. Zerbst*, 295 U.S. 490, 493, 55 S.Ct. 818, 819, 79 L.Ed. 1566 (1935) (" 'shall' is the language of command").

8. Proposed Intervenors further assert that a challenge to the lack of regulation under section 316(b) must be brought as a substantive challenge to a standard issued under sections 301 or 306. Proposed Intervenors' Suppl.Mem. at 17–18. Although we need not consider this argument to resolve the jurisdictional issue, we note that the proposition that a regulation issued under section 301 or 306 can be challenged because it lacks a section 316(b) component is incorrect. The invalidation of one regulation, or an alleged failure to promulgate the regulation, does not create a defect in another regulation unless the regulations are incapable of function-

ing independently. *See Chemical Manufacturers Association v. EPA*, 870 F.2d 177, 265–66 (5th Cir.1989) (claim that EPA must include additional pollutants in effluent guideline should be brought in district court under section 505); *cf. Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 1479, 94 L.Ed.2d 661 (1987) (constitutionally-flawed provision of statute invalidates statute's remaining provisions only if the latter are "incapable of functioning independently" from the former). Clearly, the various standards promulgated under sections 301 and 306, which set limitations on pollutants to be discharged in wastewater, function independently from a section 316(b) regulation, which governs the structures through which cooling water is taken in. Moreover, given our finding that EPA reasonably interpreted section 316(b) to permit the promulgation of an overarching regulation, and in light of EPA's reservation of a portion of the Code of Federal Regulations for the reissuance of that regulation, plaintiffs correctly directed their challenge to EPA's failure to effect that reissuance.

Proposed Intervenors also once again attempt to collapse impermissibly the distinction between threshold jurisdictional analysis and consideration of the merits, this time by suggesting that § 505 vests this Court with jurisdiction *"only* if the Administrator has in fact failed to perform a

■ Proposed Intervenors forward a final, ultimately specious, argument with respect to the existence of a mandatory duty under the Act. Proposed Intervenors contend that EPA's issuance of section 316(b) regulations in 1976 satisfied any such mandatory duty. Proposed Intervenors Suppl. Mem. at 15. Plaintiffs respond that the subsequent remand of those regulations by the Fourth Circuit in 1977 rendered the 1976 regulations a nullity, which could not have satisfied the mandatory duty established by section 316(b). Plaintiffs' Supplemental Memorandum in Opposition to Motion for Leave to Intervene at 24–25.

Thus, there appears to be a genuine dispute as to whether a regulation that has been remanded and then withdrawn can be said to satisfy a mandatory duty. We need not resolve that issue, however, to consider entering the consent decree, for the parties have chosen to settle rather than litigate that merits issue. As discussed *supra* at 10–15, we are compelled to find that the plaintiffs' allegations that EPA has failed to fulfill its duty under these circumstances is sufficiently substantial to support jurisdiction to reach evaluation of the consent decree. *See In re United States (In re "Agent Orange" Product Liability Litigation)*, 733 F.2d 10, 13 (2d Cir.1984).[9]

### The Proposed Consent Decree: Proposed Intervenors' Objections

■ Proposed Intervenors also attack the substance of the proposed Consent Decree in arguing that they should be permitted to intervene. In essence, they contend that, as the real targets of any regulation of cooling water intake structures, they have a legally protectable interest—as that term has been defined under Rule 24—in "the extent and parameters of any obligation imposed by § 316(b) upon EPA to develop regulations regarding the location, design construction, and capacity of cooling water intake structures." Proposed Intervenors' Mem. at 8. More precisely, Proposed Intervenors contend that they have an interest, which warrants intervention in this action, in whether regulations must be promulgated for cooling water intake structures, the timing and adequacy of the procedures followed in developing any regulations, and the content of any regulations proposed and ultimately adopted. Proposed Intervenors' Mem. at 10. We disagree. Examination of Proposed Intervenors' criticisms of the proposed Consent Decree, addressed in detail below, reveals that the proposed Consent Decree simply cannot be found to impair the foregoing, or any other legally protectable interests that Proposed Intervenors might have in this action.

Proposed Intervenors first challenge paragraph 2(a) of the consent decree, which requires that EPA propose section 316(b) regulations by July 2, 1999 on two grounds. The Proposed Intervenors first argue that this provision will force EPA to propose generally applicable rules, thereby precluding EPA from determining either that individual permits issued by the various states already embody the best technology available for cooling water intake structures or that the matter is so specialized that it should be dealt with on a case-by-case basis. Proposed Intervenors Suppl. Mem. at 21–22. Nothing in the consent decree, however, requires

---

non-discretionary duty under the Act." Util. Suppl.Mem. at 7 n. 4. Proposed Intervenors acknowledge their purpose in forwarding this argument, stating "In other words, in citizen suits, jurisdiction and merits are one and the same." *Id.* In so doing, the Proposed Intervenors choose to ignore the language of § 505, namely, that actions may be brought in district court "alleg[ing]" that a non-discretionary duty remains unfulfilled. *See e.g., Sierra Club v. Thomas*, 828 F.2d 783, 787 (D.C.Cir.1987) ("In three cases decided in 1975, we determined that this 'citizen suits' provision [a provision set forth in the Clean Air Act, 42 U.S.C. § 7604(a)(2), identical to the provision at issue here] grants independent jurisdiction to the district court over claims alleging that EPA has failed to perform a

'nondiscretionary duty.' "). Thus, we reiterate that the proper jurisdictional analysis does not reach the merits of plaintiff's claims but rather determines only whether the allegations set forth in the complaint are not insubstantial or frivolous.

9. The Government notes that, as in any settlement of a disputed claim, EPA has chosen, because of the benefits of settlement, not to assert defenses that it might state under Rule 12(b) and not to litigate the merits of plaintiffs' claim. According to the Government, EPA's decision to settle this matter is not a concession on any issue. Further, EPA reserves the right to assert all available defenses and litigate any disputed issues as they may arise in other cases.

EPA to propose any particular type of regulation, other than one that "implement[s] section 316(b)." Consent Decree, ¶ 1(d). The language of the Consent Decree could hardly *less* restrict the content of the proposed regulation. Accordingly, under the decree EPA could, if otherwise appropriate, propose and issue regulations that do not embody a generally applicable rule.

As the Government explains at p. 17 of its supplemental memorandum, the proposed consent decree's lack of any substantive description of the proposed regulation's content is fully consistent with long-standing EPA policy, reflecting the requirements of the Administrative Procedure Act, 5 U.S.C. § 553, that it will not decide the substance of a proposed regulation before the information-gathering process has been completed and until all information-gathering has been completed and all information (including public comments) has been fully and fairly considered. The decree's lack of a substantive mandate is also required by the limited nature of this Court's jurisdiction under section 505. Under that section, district courts are empowered only to order EPA to comply with a mandatory duty; "[t]he substance of the Administrator's decision is beyond the power of the district court." *EDF v. Thomas,* 870 F.2d at 896.

Proposed Intervenors next alleged concern, namely, that EPA, having issued a proposed regulation, will be less likely to accept the Proposed Intervenors' argument that the regulation should not be adopted, *see* Proposed Int. Suppl. Mem. at 22—derives from sheer speculation. The consent decree permits EPA to determine that, based upon public comment and further reflection, the proposed regulation should be modified, or should not be issued at all. Proposed Intervenors raise the pure conjecture that ¶ 2(b) of the decree, which calls on EPA to "take final action with respect to the Regulations,"

might someday be interpreted to require EPA to in fact issue regulations regardless of what information the rulemaking process reveals. Proposed Intervenors' Mem. at 22 n. 13. The definition of "take final action," however, does not so restrict EPA—the term "shall mean a final decision, in writing, by the Administrator on the issuance of Regulations." Consent Decree, ¶ 1(f). EPA makes clear in its July 1 letter to this Court that the decree permits EPA to determine, at the end of the process, that regulations are not called for, and plaintiffs have never taken issue with such a characterization of the decree. Contrary to Proposed Intervenors' allegation, EPA has not, by proposing to enter into the proposed Consent Decree, obligated itself to issue *any* regulation if none is called for (a position that Proposed Intervenors appear likely to advocate during the course of the rulemaking process embodied in the Consent Decree).

Proposed Intervenors also attack three procedural provisions in the decree which, it is implied, combine to endow the plaintiffs with "special powers of oversight in the section 316(b) regulatory process." Proposed Intervenors Mem. at 23. More precisely, Proposed Intervenors point to the decree's provisions concerning written status reports (¶ 3(a)), requested court conferences (¶ 3(c)),[10] and procedures for modifying the decree (¶ 4). *Id.* at 23–24. These wholly appropriate procedures do not impair the Utilities' interests in the least.[11]

Proposed Intervenors first suggest that plaintiffs will incline toward manipulation of the foregoing procedures to obtain Court orders requiring EPA to take "a particular direction" in the rulemaking process. Proposed Intervenors Suppl. Mem. at 25; *see id.* at 26 ("requiring EPA to refocus its efforts"). This contention ignores, however, that such orders—addressing the substance (as op-

---

**10.** It should be noted that ¶ 3(c) simply permits the plaintiffs to request conferences with the Court, a right they possessed in any event, and allows EPA to oppose those conferences on the grounds that "a conference is not warranted."

**11.** The Government has also indicated that EPA does not object to providing copies of the status reports to Proposed Intervenors, or to any other

party that requests them. *Compare NRDC v. Costle,* 561 F.2d 904, 909 (D.C.Cir.1977) (granting intervention where EPA required to give *oral* briefings to parties) (cited in Proposed Intervenors' Mem. at 23–24). Nor does EPA object to having the Utilities heard as an *amicus* with respect to the conferences or to any applications to modify the decree.

posed to the timing) of EPA's rulemaking process—would invite a challenge based upon this Court's alleged limited jurisdiction. *EDF v. Thomas, supra,* 870 F.2d at 896.

Proposed Intervenors next raise the concern that only the parties to the decree will have input regarding the modification of deadlines. Proposed Intervenors' Suppl. Mem. at 25–27. This concern is not supported by the record. First, as noted, EPA does not object to the Proposed Intervenors being heard as *amicus* on any modification motion brought by either party. To the extent Proposed Intervenors in the future learn that plaintiffs have initiated proceedings designed to establish shorter deadlines, and to limit unduly Proposed Intervenors' time to participate in the rulemarking, Proposed Intervenors Suppl. Mem. at 26–27, EPA indicates its interest in seeing to it that Proposed Intervenors be afforded every opportunity to be heard. Parenthetically, we note that in advancing its position, Proposed Intervenors have made an implicit concession that the present schedule is adequate to permit Proposed Intervenors to· participate fully in the process. Indeed, Proposed Intervenors have not even hinted that the seven-year rulemaking period is in any way insufficient.

To the extent Proposed Intervenors are concerned that plaintiffs will seek *more* time, they cannot seriously contend that they are harmed by EPA's taking too long to regulate their industry. Moreover, the Government has indicated that if Proposed Intervenors are concerned ·that plaintiffs may seek an extension of the proposal deadline (allowing EPA to receive more information), without seeking an increase in the deadline for taking final action, *see* Proposed Intervenors Suppl. Mem. at 27, EPA would, if necessary, request an increase in the time between the proposal date and the date for taking final action.

Accordingly, Proposed Intervenors fail to articulate a single substantive aspect of the proposed Consent Decree that might, except in the event of the most speculative of circumstances, impair their interests. It is instructive that, in affirming the denial of a nearly identical motion by sixty-seven utilities to intervene in a citizen suit under the Clean Air Act, 42 U.S.C. § 7401 et seq., the Second Circuit noted:

> On appeal the utilities claim primarily that their interest is not so much in the ultimate rule promulgated by the EPA, as Judge Bartels understood it to be, but in having an opportunity to help shape the schedule for this judicially compelled rulemaking. The ·utilities argue that they might have insufficient time to prepare a response to any proposal or to submit comments during the judicially established comment period. They further point out that absent intervention, they would have no standing to obtain an extension of the deadlines imposed by the district court ... [E]ven had EPA obeyed the schedule commanded by the statute, there would have been no guarantee that even the seven months prescribed by the district court's order would have been available for "meaningful and effective" comment. See 42 U.S.C. § 7409(d). Finally, the statute requires EPA to base its decisions on the latest scientific knowledge that bears upon a given NAAQS [air quality standard]. 42 U.S.C. § 7409(b)(1). There is no reason to believe that EPA will shirk its statutory duty to solicit and consider such information, or that the utilities and their experts will not have adequate opportunity to present their views.

*American Lung Association v. Reilly,* 962 F.2d 258 (2d Cir.1992). Thus, where, as here, Proposed Intervenors can offer no evidence that (1) their views will not be taken into account in the administrative process set forth in the proposed Consent Decree; (2) their interests will be prejudiced as a result of the timetable—and the provisions for its modification—contained in the proposed Consent Decree; or (3) EPA is under any obligation imposed by the proposed Consent Decree to issue certain substantive regulations, or any regulations at all, there is simply no basis for concluding that intervention is warranted.

. This conclusion is further bolstered by the prejudice and delay that will accrue to the original parties in this action if intervention is permitted. Citizen suits that seek to enforce environmental regulations in the public interest present a special problem in this regard. As Judge Goettel of this Court not-

ed in *Orange Environment, Inc. v. County of Orange,* 817 F.Supp. 1051, 1061, n. 4 (S.D.N.Y.1993), "any added delays that forestall resolution of these environmental issues [in that case the outcome of negotiations as to the status of wetlands] risks great prejudice to the parties and the general public."

### The Proposed Consent Decree: Standard of Review

To enter a consent decree, the Second Circuit has stated that we must determine that the decree: (1) "spring[s] from and serve[s] to resolve a dispute within the court's subject-matter jurisdiction"; (2) "comes[s] within the general scope of the case made by the pleadings"; and (3) "further[s] the objectives of the law upon which the complaint was based." *Kozlowski v. Coughlin,* 871 F.2d 241, 244 (2d Cir.1989) (quoting *Local No. 93 Firefighters v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986)). Under this standard, the proposed Consent Decree in this action clearly passes muster.

■ First, as discussed extensively *infra* at 6–15, this Court may exercise subject matter jurisdiction over this dispute. Second, with respect to the other two prongs of the *Firefighters* test, not only does the Consent Decree on its face further the objectives of the Act and its particular provisions implicated here i.e., to regulate the environmental impact on the nation's waters of industry in general and cooling water intake structures in particular—by setting down a timetable within which EPA shall issue such regulations (or determine not to issue such regulations), but we also note that such a Consent Decree is entitled to a presumption in favor of settlement. *See United States v. Akzo Coatings of America, Inc.,* 949 F.2d 1409, 1436 (6th Cir.1991) (presumption in favor of settlement "is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field") (citing *United States v. Cannons Engineering Corp.,* 899 F.2d 79, 84 (1st Cir. 1990)).

Finally, we observe that—as a matter of public policy—the essential position urged by Proposed Intervenors in opposition to the entry of this Consent Decree, namely that this Court must address the merits of the litigation prior to approving any settlement of those claims, would have disastrous effects if we were to adopt it. Such a rule would be contrary to the fundamental purpose of settlements: to allow the parties and the court to avoid the burden of litigating and adjudicating the merits of an action. *See, e.g., Bash v. Firstmark Standard Life Ins. Co.,* 861 F.2d 159, 162 (7th Cir.1988); *Janus Films v. Miller,* 801 F.2d 578, 582 (2nd Cir. 1986).[12]

Nor, as the Government observes at p. 10 of its legal memorandum, can this argument—that cases cannot be settled unless the court first determines the merits of the case—be limited simply to section 505 claims. Just as section 505 requires at least a non-frivolous allegation of an unfulfilled duty, so too do other jurisdictional statutes turn upon an allegation of some legal wrong. For example, district court jurisdiction over tax claims exists "for recovery of any ... tax alleged to have been erroneously or illegally assessed or collected, ... or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws." 28 U.S.C. § 1346(a)(1). Thus, under Proposed Intervenors' theory of this motion, a district court could not approve a settlement of a tax claim unless the court first satisfied itself that the tax alleged to have been wrongly assessed was in fact wrongly assessed—a wholly untenable state of affairs. The policy implications of Proposed Intervenors' application to intervene, then, are unacceptable.

Accordingly, for this and the other reasons set forth in this Opinion and Order, Proposed Intervenors' motion to intervene is denied.

SO ORDERED.

---

12. In point of fact, part of the mutual consideration given by the parties in the consent decree was the benefit of not having to litigate the merits of this case. *See* Consent Decree at 2 ("it is in the best interests of the public, the parties and judicial economy to resolve the action without further litigation").